IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

RICOH COMPANY, LTD.,

                Plaintiff,

      v.

QUANTA COMPUTER, INC.
and QUANTA STORAGE, INC.

             Defendants.

OPINION and ORDER

06-cv-462-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

A jury awarded plaintiff Ricoh Company, Ltd. $14.5 million on its claims that defendants Quanta Computer, Inc. and Quanta Storage, Inc. infringed claims 1 and 8 of U.S. Patent No. 5,063,552 and claims 1, 2 and 3 of U.S. Patent No. 6, 661,755. Both patents are directed to improving the process of recording optical discs. The '552 patent discloses a method plaintiff calls "Zone CLV" for controlling the velocity at which a disc drive spins and records an optical disc to maximize recording capacity without requiring additional complicated machinery; the '755 patent discloses a method for "buffer underrun protection," that is, pausing the recording process when information is being recorded faster than it is received from the buffer to prevent the disc from being ruined by nonsense data.

1

Now before the court are defendants' motions for judgment as a matter of law, or, in the alternative, for a new trial, and its motion for a mistrial.  Because I conclude that defendants have failed to carry their burden to show that no reasonable jury could find in plaintiff's favor or that the jury's verdict was unfair, defendants' motions will be denied.

I.  MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER FED. R. CIV. P. 50(b)

A.  <u>Direct Infringement</u>

In deciding defendants' motion for summary judgment, dkt. #300, I concluded that plaintiff had failed to raise a genuine issue of material fact on the question whether any defendant "makes, uses, offers to sell, or sells [an invention disclosed by the '552 patent or the '755 patent] within the United States or imports into the United States [such an] invention" in violation of 35 U.S.C. § 271(a).  The Court of Appeals for the Federal Circuit affirmed this part of the judgment.  <u>Ricoh Co., Ltd. v. Quanta Computer Inc.</u>, 550 F.3d 1325, 1344 (Fed. Cir. 2008).  However, the parties agree that a prerequisite to plaintiff's claims for contributory infringement under § 271(c) and active inducement under § 271(b) is proof that consumers and companies use the accused products in a manner that infringes the patents.  Jury Instructions, dkt. #488, at 7-8.

According to defendants, plaintiff failed to adduce sufficient evidence to show that

2

the accused products perform particular elements for each of the claims in dispute. However, I agree with plaintiff that defendants did not raise any of these arguments in their Rule 50(a) motion, which means they may not assert them now.  Laborers' Pension Fund v. A & C Environmental, Inc., 301 F.3d 768 (7th Cir. 2002); Mid-America Tablewares, Inc. v. Mogi Trading Co., 100 F.3d 1353, 1363-64 (7th Cir. 1996); Downes v. Volkswagen of America, Inc., 41 F.3d 1132, 1139-40 (7th Cir. 1994).  Defendants admit that they did not raise any issues about direct infringement in their Rule 50(a) motions, but their position is that they did not have to.  Their argument bears repeating:

> Ricoh was not asserting any claims of direct infringement (because the Court's grant of summary judgment on the issue was affirmed by the Federal Circuit). Ricoh, 550 F.3d at 1334-36. Thus, Defendants could not have asked for judgment as a matter of law on a claim that was not at issue at the trial. Fed. R. Civ. P 50(a). Ricoh admits, however, that demonstrating direct infringement by either end-users or Branded Computer Companies was a necessary element for it to establish indirect infringement. Docket No. 488 at p.7. Thus, Defendants appropriately raised the issue by asking for judgment as a matter of law on the only claim that had been presented at trial, i.e. indirect infringement.

Dfts.' Reply Br.,  dkt. #541, at 11.

Defendants' position seems to be that plaintiff was required to prove direct infringement, but they had no obligation to point out any deficiencies with that proof until after the trial was over.  It was enough that they challenged plaintiff's proof generally on contributory infringement and active inducement.  In other words, so long as they raised

*some* argument regarding a claim in a motion under Rule 50(a), they did enough to preserve any other argument on the same claim.

That is not how it works, as the rule itself makes clear.  A Rule 50 motion must "specify . . . the law and facts that entitle the movant" to judgment as a matter of law.  Fed. R. Civ. P.  50(a)(2).  This means that a "motion under Rule 50(b) is not allowed *unless the movant sought relief on similar grounds under Rule 50(a)* before the case was submitted to the jury."  Exxon Shipping Co. v. Baker, 128 S. Ct. 2605, 2617 (2008) (emphasis added). I explained this in Extreme Networks, Inc. v. Enterasys Networks, Inc., 2008 WL 4756498, *1 (W.D. Wis. 2008), when the defendant made a similar argument:

> [T]he motion must be specific enough to give notice to the plaintiff of the hole in its case so that it can attempt to put in more evidence while there is still an opportunity to do so.  Defendant cannot preserve all possible arguments simply by listing the elements of a claim and arguing generally that the plaintiff did not meet them. This gives the plaintiff no notice of the law or facts that might entitle defendant to judgment as a matter of law.

It is the same in this case.  Defendants may not lie in wait with arguments about deficiencies in plaintiff's case until it is too late for plaintiff to fix them.  Because that is what defendants are attempting to do with their arguments related to direct infringement, I cannot consider those arguments.

4

B. <u>Contributory Infringement</u>

Under 35 U.S.C. § 271(c), a defendant may be held liable for "contributory" infringement if it

> offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use.

In the summary judgment opinion, I concluded that plaintiff could not meet this standard because each of the drives had a "substantial noninfringing use" of playing discs. On appeal, the court concluded that plaintiff should have the opportunity to show that defendants' optical disc drives "contain *hardware or software components* that have no substantial noninfringing use other than to practice Ricoh's claimed methods." <u>Ricoh</u>, 550 F.3d at 1344 (emphasis added). Thus, the question is not simply whether the drives themselves have noninfringing uses, but whether a "component" has the sole use of performing a patented method. Taking language from the court of appeals' opinion, the parties agreed on remand that plaintiff must show that the accused products have such a component that is "distinct and separable" from the rest of the drive. <u>Id.</u> at 1336; Jury Instructions, dkt. #488, at 7.

To prove this claim, plaintiff's experts testified about tests they had conducted on defendants' drives in which they disabled the software code that performs the Zone CLV

5

method of recording and buffer underrun protection.  In both cases, the drives continued to function but did so without the patented features.  Defendants say that plaintiff failed to prove a violation of § 271(c) for two reasons:  (1) plaintiff did not identify with the necessary specificity the components that perform the methods in the '552 patent and '755 patent; and (2) plaintiff adduced no evidence that the components were "separable" from the rest of the drive.

In support of its argument that plaintiff is required to "specifically identify" the components, defendants cite the following passage from <u>Intellectual Science and Technology, Inc. v. Sony Electronics, Inc.</u>, 589 F.3d 1179, 1187 (Fed. Cir. 2009):

> This court has never stated that a patentee can survive summary judgment of non-infringement on an apparatus claim without specifically identifying the allegedly infringing structure in the accused device. . . . Without clear identification of the claimed structure or its equivalent in the accused devices, Intellectual Science cannot survive summary judgment.

Defendants' citation to this passage is disingenuous.  Although they acknowledge in their brief the irrelevant distinction that <u>Intellectual Science</u> was a summary judgment decision, they fail to mention that the case had nothing to do with proof requirements under § 271(c). Rather, the court was considering whether the plaintiff had proven infringement on a means-plus-function claim.  As the court explained, an accused device does not infringe a means-plus-function claim unless "the relevant structure in the accused device performs the identical function recited in the claim and that structure is identical or equivalent to the

6

corresponding structure in the specification." Id. at 1183.  Thus, if the plaintiffs did not identify a particular structure in the accused device, it was impossible to determine whether any infringement has occurred.

In this case, the court of appeals did not suggest that a similar requirement exists with respect to § 271(c).  Rather, the question is simply whether a reasonable jury could find that the accused devices contain components that have no substantial noninfringing use.  Ricoh, 550 F.3d at 1344.  Thus, I see no reason why plaintiff needed to do more than adduce evidence from which it could be reasonably inferred that the accused devices contain a component (in this case, code) that has no function but to perform the patented methods. The testimony of plaintiff's experts was sufficient for that purpose.

Defendants' argument that plaintiff failed to prove that the software code is "separable" rests on the premise that it was not enough to show that the drives work even when the relevant code is disabled.  Rather, defendants seem to be arguing that plaintiff needed to test the drives after "removing" the code.  Dfts.' Br., dkt. #520, at 7 ("Dr. Schlesinger never removed any lines of software code from the accused products to demonstrate that the products would still function.")  However, defendants are mistaken that there was only one way that plaintiff could prove its claim; plaintiff was permitted to meet its burden in any way that would permit a reasonable jury to infer that the components were "separable."  Defendants identify no reason to believe that disabling the software is

7

any different from removing it for the purpose of proving this part of the claim, or, if there is a difference, that a jury could not infer reasonably that disabling the software code would have the same effect on the drive's performance as removing it altogether.

Finally, defendants challenge the testimony of plaintiff's expert regarding the testing he did on buffer underrun protection because he did not recall the particular models he had tested. Trial Tr., Vol. 2B, dkt. #460, at 7. This might have been a problem if defendants had pointed to any evidence suggesting that any of their drives in existence in 2002 (when the expert began testing the drives) performed the buffer underrun protection feature differently from the way any of the accused drives performed it. Because defendants do not point to such differences, a reasonable jury could infer that the tests conducted by the expert would produce the same results in the accused drives and that the "component" responsible for that feature is "separable" in all of them.

### C.  Active Inducement

Under 35 U.S.C. § 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer." Citing Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 545 U.S. 913 (2005), the court of appeals concluded that defendants could be held liable for active inducement if the evidence showed "statements or actions directed to promoting infringement." Ricoh, 550 F.3d at 1341. In particular, the court quoted the following

passage from <u>Grokster</u>:

> Evidence of active steps . . . taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe, and a showing that infringement was encouraged overcomes the law's reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use.

<u>Ricoh</u>, 550 F.3d at 1341 (quoting <u>Grokster</u>, 545 U.S. at 936).  In this case, the jury found that defendants actively induced infringement of both patents by its corporate customers such as Dell and Hewlett-Packard as well as by individual consumers who bought computers from those companies.  Verdict, dkt. # 489, at 5.

Defendants repeat their argument that plaintiff failed to identify "separable" components that infringe the asserted patents, but I need not address that argument again.  Alternatively, defendants argue that plaintiff "has shown no evidence of any affirmative acts that would or could induce infringement."  Dfts.' Br., dkt. #520, at 10.

To support a finding that defendants promoted infringement, plaintiff relies on three types of evidence:

(1) specification sheets that list Zone CLV and buffer underrun protection as a feature in the drive; the specifications are sent to defendants' customers;

(2) presentations to corporate customers in which defendants discussed the buffer underrun protection feature; and

9

(3) "fine tun[ing]" that defendants made to the software performing the accused methods so that the drives "automatically and inherently use those features."

The evidence on inducement at trial was virtually the same as it was on summary judgment. Although I concluded in the summary judgment opinion that none of these acts showed that defendants "encouraged" acts of infringement, the court of appeals concluded that categories (2) and (3) could be probative in showing infringement under § 271(b). (For reasons that are not clear, the court of appeals said nothing about the specification sheets.) With respect to the presentations, the court stated:

> The potential relevance of the presentation is two-fold. First, the presentation is relevant to the extent it indicates QSI possessed the requisite intent that its drives be used to perform the infringing methods. Second, the presentation is relevant to the issue of whether it encouraged Dell to use the drives in an infringing manner. That the presentation may have failed to communicate any information regarding the patented methods or the possibility of infringement does not render it irrelevant as evidence of QSI's intent.

Ricoh, 550 F.3d at 1342.

With respect to the "fine tuning," the court stated that

> QSI's role as the designer and manufacturer of the optical drives in question may evidence an intent sufficiently specific to support a finding of inducement. . . . In this case, QSI has incorporated into its optical drives software that instructs the hardware to perform a series of steps. Ricoh asserts that the only function of certain software components is to instruct the drives to perform its patented methods. See, e.g., Schlesinger Declaration at 11. Ricoh thus argues that QSI's specific intent that the '552 and '755 patents be infringed is shown by this affirmative act of incorporating components whose sole purpose is to cause the drives to operate in a manner that infringes the

10

'552 and '755 patents under normal circumstances. *To the extent that the drives do contain components which are in fact separable from those used to implement noninfringing functions, and to the extent that the components do not in fact have a purpose other than the performance of infringing functions under normal use conditions, such evidence would create a material issue of fact regarding QSI's intent that its drives be used to infringe the '552 and '755 patents, which could not be decided on summary judgment.*

Id. at 1343 (emphasis added).

I have concluded in the context of plaintiff's contributory infringement claim that plaintiff *has* adduced sufficient evidence to show that "the drives do contain components which are in fact separable from those used to implement noninfringing functions, and . . . that the components do not in fact have a purpose other than the performance of infringing functions under normal use conditions." Accordingly, under the law of the case, I must conclude that plaintiff has adduced sufficient evidence to prove its claim of active inducement.

## D.  Obviousness

At trial the jury found that defendants had failed to prove that any of the asserted claims were invalid because they were anticipated or obvious. In their motion for judgment as a matter of law, defendants do not challenge any of these findings except the one of nonobviousness for claims 1 and 8 of the '552 patent.

The question for determining obviousness is whether a person of ordinary skill in the

11

field would have been prompted at the time to combine the elements or concepts from the prior art in the same way as the claimed invention and could have developed the claimed invention by the application of common sense and ordinary skill.  Comaper Corp. v. Antec, Inc., — F.3d —, 2010 WL 681355, *7 (Fed. Cir. 2010).  "Underpinning that legal issue are factual questions relating to the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the art, and any relevant secondary considerations, such as commercial success, long-felt need, and the failure of others."  PharmaStem Therapeutics, Inc. v. ViaCell, Inc., 491 F.3d 1342, 1359-60 (Fed. Cir. 2007).  It is defendants' burden to show by clear and convincing evidence that a particular claim is obvious.  AK Steel Corp. v. Sollac & Ugine, 344 F.3d 1234, 1238-39 (Fed. Cir. 2003).

Claim 1 of the '552 patent discloses:

A method for controlling an information recording and/or reproduction speed "f" and a rotation speed "n" of an optical disk used in an information recording and/or reproduction device, said optical disk having a plurality of tracks in the form of concentric circles or a spiral, said information recording and/or reproduction device being adapted to access said tracks by means of a light beam while rotating said optical disk, thereby to optically record information on or reproduce information from said tracks, said method comprising the steps of:

dividing said tracks into a plurality of concentric annular blocks which are different in radius from each other;

changing said information recording and/or reproduction speed "f" in

12

accordance with the radius of a track to be accessed in such a manner that said recording and/or reproduction speed "f" is constant within a block but different as between said blocks depending on the block radii;

and changing said rotation speed "n" of said optical disk in such a manner that f/(n*r) is constant, where "r" is the radius of said track to be accessed.

The parties seem to agree that one piece of prior art, the Quinlan reference, disclosed the first two elements of this claim, but not the third because Quinlan does not disclose a recording process in which f/(n*r), or the data density of the disc, is kept constant within each track.  Trial exh. #559.  Defendants argue that the difference is insignificant because Quinlan "teaches the desirability of having a constant value."  Dfts.' Br., dkt. #541, at 15. However, teaching the "desirability" of an invention means little unless there is a corresponding teaching regarding how to *achieve* the desired result or unless that method would be obvious to a person of ordinary skill in the art.  PharmaStem Therapeutics, 491 F.3d at 1360 (prior art does not render invention obvious unless "person of ordinary skill in the art would have had reason to . . . carry out the claimed process, *and would have had a reasonable expectation of success in doing so*") (emphasis added).  Quinlan teaches a method of minimizing fluctuations in data density by making smaller zones, Trial exh. #559, not a method of actually keeping density constant within a zone.

Also, plaintiff points to differences in the medium used by Quinlan (magnetic) versus the '552 patent (optical).  In arguing that the medium is irrelevant, defendants cite a

13

statement from the patent examiner that, "as far as the purpose of the ['552] invention, it makes no difference whether the mode of storage is optical or magnetic." Dfts' Br., dkt. #520, at 19 (quoting trial exh. #558 at 96).

Sometimes it may be obvious that a method for one type of device will apply to another. <u>KSR Intern. Co. v. Teleflex Inc.</u>, 550 U.S. 398 (2007) ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.") However, just because the '552 patent could apply to both magnetic discs and optical discs does not necessarily mean that it was obvious for the inventor to use Quinlan to come up with the '552 patent. Defendants are confusing the scope of the patent with the scope of the prior art. Because defendants have the burden on this point, they cannot prevail simply by pointing out that Quinlan *can* be applied to other media; they must show that it was obvious to do so.

Plaintiff's expert testified that a person of ordinary skill in the art (who the parties agree would be a person with a college degree and a few months of experience) would not know how to implement claim 1 of the '552 patent by reading Quinlan. In addition, he cited a number of secondary indicia of nonobviousness, such as plaintiff's licensing of the patent to other companies and the longstanding nature of the problem solved by the patent. Trial Tr., Vol. 5C, dkt. #477, at 6-7. Because defendants put in no evidence to rebut that

testimony, I cannot conclude that defendants have shown as a matter of law that the claim

is invalid as obvious.  Further, because claim 8 is dependent from claim 1, I need not discuss

that claim separately.

## II. MOTION FOR A NEW TRIAL UNDER RULE 59

### A.  Improper Argument and Testimony

Defendants argue that the court should declare a mistrial because of three instances

in which plaintiff's witnesses or counsel stated that defendants had been informed by

plaintiff that they were infringing, but they refused to stop or purchase a license.

Defendants characterize these references as evidence and argument related to willful

infringement, an issue I concluded should not be part of the case because plaintiff could not

show that defendants either knew or recklessly disregarded "an objectively high likelihood

that their actions constituted infringement of a valid patent.  In re Seagate Technology, LLC,

497 F.3d 1360, 1371 (Fed Cir. 2007)."  Order, dkt. #492, at 2, entered Nov. 18, 2009.

The first instance occurred during opening statements, before I concluded that

willfulness would not be part of the case.  Although defendants say that plaintiff's opening

statement "returned to the theme of willful infringement several times," dfts.' Br., dkt. #493,

at 2, defendants did not object until *after* counsel finished the statement, suggesting strongly

that they waived any objection by sitting in silence when they could have prevented much

15

of the damage.  Defendants say that they did not object sooner because they were not sure whether plaintiff's remarks were improper, but that makes no sense.  The requirement to object in a timely manner is not contingent on a requisite level of certainty that the objection is a proper one.  Further, defendants' silence supports *plaintiff's* argument that it had no reason to believe it should refrain from discussing willful infringement because I had not issued a ruling on the matter.  In any event, I instructed the jurors even before defendants began their opening statement that "they should not draw any inference from defendants' mere refusal of Ricoh's license offer."  Trial Tr., Vol. 1C, dkt. #446, at 12.  In addition, defendants provided their own clarification in their opening statement, telling the jury that plaintiff actually *paid* other companies when licensing its patents so that it could obtain the rights to use other patented technology in its drives.  Id. at 14-15. Defendants were not entitled to more.

The second instance involved testimony from defendants' own witness, chief financial officer William Wang, on cross examination when Wang responded to questions about the investigation defendants conducted after plaintiff accused them of infringement.  In the third instance, counsel for plaintiff used the following sentence in his closing argument:  "Ricoh told Quanta that Ricoh thought Quanta was infringing its patents, but Quanta used those patents without permission."  Defendants did not object to the testimony or the argument. (In their brief, defendants argue that they did object in the second instance, but a review of

the transcript shows that they objected to another matter a few minutes earlier that was unrelated to willfulness.  Trial Trans., Vol. 4A, dkt. #469, at 31 (counsel stating that he "just [doesn't] see the relevance" of a "marketing analysis").

Plaintiff argues that its references to defendants' knowledge were relevant to its claims for contributory infringement and active inducement, which it says required proof that defendants knew they were infringing.  I cannot say that plaintiff's interpretation of the standard is an unreasonable one.  In the summary judgment opinion, I noted the ambiguity in the standard for active inducement:

> the standard for intent leaves something to be desired in terms of clarity: "a certain level of intent" is not exactly self-defining. The central question appears to be whether the plaintiff must prove only that the defendant knew of the acts that cause infringement or whether the plaintiff must also prove that the defendant knew or should have come to the legal conclusion that its acts would cause infringement.

Dkt. #300, at 32-33.

I did not resolve this question in the summary judgment opinion, the court of appeals did not address it all and the parties did not seek clarification in limine.  As plaintiff points out, even defendants seemed to assume that evidence of defendants' knowledge of infringement was relevant for the purpose of indirect infringement.  They relied on Wang's testimony in their closing argument, arguing that it showed that "Quanta Storage investigated the patents when it was first approached in late 2004 and it did not feel it had

17

infringed." Trial Tr., Vol. 9B, dkt. #508, at 50.  In light of *both* sides' equivocal conduct on this issue, it is difficult to argue that plaintiff acted so improperly as to require a mistrial.

However, even I concluded that plaintiff was overreaching, defendants have not shown that the evidence or argument influenced the jury's decision.  It could hardly be a surprise to the jury that plaintiff accused defendants of infringement before filing the lawsuit and that defendants refused to capitulate.  If it were otherwise, the jury's presence would not have been required.  Defendants have failed to make a persuasive argument that the jurors were likely to be so "inflamed" by defendants' refusal to buy a license that the jurors would disregard the instructions they swore to follow and decide the case against defendants out of a desire to punish them.  If the jurors actually believed that plaintiff had failed to prove infringement, they would not be influenced by the refusal to buy a license because, in that case, they would have agreed that a license was not necessary.

Tellingly, defendants do not attempt to analogize the facts of this case to any other in which a court granted a new trial.  In fact, they cite *no* authority for their motion.  Under the circumstances, I cannot conclude that defendants have shown "that the jury's verdict resulted in a miscarriage of justice. . . cries out to be overturned or shocks [the court's] conscience." Davis v. Dept. of Corrections, 445 F.3d 971, 979 (7th Cir. 2006) (internal quotations omitted).

B.  <u>Damages</u>

During the damages phase of the trial, plaintiff argued for $27 million in compensatory damages and defendants argued for $3.3 million.  Now defendants argue that the jury's award of $14.5 million is excessive.  "Under the federal standard for reviewing compensatory damages we assess whether the award is monstrously excessive, whether there is no rational connection between the award and the evidence and whether the award is comparable to those in similar cases."  <u>Thomas v. Cook County Sheriff's Dept.</u>, 588 F.3d 445 (7th Cir. 2009) (internal quotations omitted).

Defendants attack the verdict indirectly by arguing that the opinion of plaintiff's damages expert was flawed in two respects: (1) plaintiff relied on dissimilar licensing agreements when determining a reasonable royalty rate for the '552 and '755 patents; and (2) plaintiff adjusted the royalty rate higher "to take into account the strength of U.S. patent rights."  (Defendants raise additional arguments in their reply brief, but those are waived. <u>Narducci v. Moore</u>, 572 F.3d 313, 324 (7th Cir. 2009).)  The gist of defendants' first argument is that plaintiff's expert, David Gross, relied on licensing agreements involving a larger number of patents, something defendants say is prohibited by <u>Lucent Technologies, Inc. v. Gateway, Inc.</u>, 580 F.3d 1301, 1332 (Fed. Cir. 2009). Defendants raised this argument twice before (in their motions in limine, dkt. #392, and a renewed motion, dkt. #479) and I rejected it both times.

19

Lucent does not stand for the proposition that licensing agreements are not comparable as a matter of law unless they involve the same number of patents as those involved in the lawsuit.  In that case, the court overturned a $358 million lump-sum award, noting *several* problems with the award, including that it was "roughly three to four times the average amount in the lump-sum agreements in evidence." Id. at 1332.  Although the court noted that the plaintiff's expert relied on an agreement that "appears to govern IBM's licensing of its entire patent portfolio," id. at 1328, the error was not that the expert failed to use licensing agreements with the same number of patents, but that he had failed to explain how the licensing agreements were comparable.  In fact, the court noted that the expert "provide[d] no analysis of [the other] license agreements, other than, for example, noting the agreement was a cross-license of a large patent portfolio and the amount paid." Id. at 1329.

In this case, Gross testified in detail why he believed the ten licensing agreements on which he relied were comparable, focusing primarily on the type of technology involved in the patents and their importance to making the product.  Trial Tr. Vol 8B, dkt #500, at 30 ("The fact is that a large number of patents aren't commercially valuable. What matters is, is this an important patent, is this a blocking patent, is this patent necessary to produce and sell recordable optical disc drives.") Despite three opportunities to do so, defendants have failed to identify any reason why Gross's conclusion is unsound.

20

With respect to the expert's upward adjustment of the royalty rate, he testified that the royalty rate should be higher in a case like this one limited to sales in the United States because a disproportionate amount of a worldwide license's value comes from this country. To support this conclusion, he noted that patent enforcement is much more prevalent in the United States than other parts of the world, such as Europe and Japan.

Defendants dispute Gross's view, but that does not mean the jury was required to disregard it. In any event, defendants' sole focus on Gross's conclusion is misplaced because the jury did not adopt Gross's recommendation of $27 million in compensatory damages. Because the jury picked the lower figure of $14.5 million, it may be that the jury largely or entirely discounted Gross's opinion that the royalty rate should be higher for U.S. sales. Thus, even if I assumed that plaintiff failed to properly support its view that U.S. license agreements are entitled to a higher royalty rate, I could not say that there is no rational connection between the award and the evidence.

ORDER

IT IS ORDERED that

1. The renewed motion for a mistrial or a new trial filed by defendants Quanta Storage, Inc. and Quanta Computer, Inc., dkt. #493, is DENIED.

2. Defendants' motion for judgment as a matter of law, or, in the alternative for a

21

new trial, dkt. #519, is DENIED.

Entered this 22nd day of March, 2010.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge